UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PAMELA ASHBY, AS PERSONAL | * | |
| REPRESENTATIVE OF THE | * | |
| ESTATE OF TREVOR | * | |
| SAUNDERS, | * | CIVIL ACTION |
| Plaintiff, | * | |
| | * | DOCKET NO.: |
| v. | * | |
| | * | |
| ANDROSCOGGIN COUNTY, ERIC | * | |
| SAMSON, JEFFREY CHUTE, | * | |
| LANE FELDMAN, WILLIAM | * | |
| GAGNE, TAMMY CHASE, JOHN | * | |
| CLEVENGER, PAUL HAMANN, | * | |
| MIRANDA KOLOGENSKI, JAMES | * | |
| LANGELIER, VICTORIA | * | |
| LANGELIER, JERRY LAROCQUE, | * | |
| REBECCA LEDUC, BRYAN | * | |
| LITCHFIELD, REGINALD | * | |
| LITTLEFIELD, ISAAC POLIQUIN, | * | |
| JANE DOE(S), AND JOHN DOE(S), | * | |
| Defendants. | * | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Pamela Ashby, as Personal Representative of the Estate of Trevor Saunders, by and through her attorneys, states as follows:

## INTRODUCTION

1.    Trevor Saunders ("Trevor") was born on August 21, 1998.

2.    On January 16, 2023, Trevor was in a single-car accident. He was arrested for operating a vehicle after having his license revoked and operating a vehicle under the influence of alcohol.

3.    As part of an agreement with the Androscoggin County District Attorney, Trevor's bail was revoked at the Androscoggin County Jail ("ACJ") on October 25, 2023.

4.    He was supposed to serve a 45-day sentence at ACJ.

5.    On November 18, approximately three weeks into his sentence, Trevor was found dead in his cell bed.

6.    The cause of death was pneumonia, a disease that has been curable in the United States for approximately 80 years.

7.    Trevor's pneumonia was the result of untreated, infected pressure ulcers.

8.    Defendants could not have been particularly surprised to find Trevor dead. He had been deteriorating before their eyes over the course of several weeks.

9.    The Eighth Amendment to the United States Constitution, incorporated against the States by the Fourteenth Amendment, prohibits state and local jails from subjecting inmates to cruel and unusual punishment. The Eighth Amendment prohibits jails and their employees from ignoring an inmate who is suffering a serious, life-threatening medical condition.

10.    Defendants were deliberately indifferent to the obvious signs that Trevor was in peril and required medical care and attention.

11.    Through this action, Plaintiff Pamela Ashby seeks justice and accountability for the violations of Trevor's constitutional rights.

## **PARTIES**

12.    Plaintiff Pamela Ashby ("Pam"), a resident of Lewiston, County of Androscoggin, and State of Maine, is Trevor's mother and the duly-appointed Personal Representative of his Estate.

13.    Defendant Androscoggin County is a county in the State of Maine. At all times relevant to this Complaint, Androscoggin County owned and operated the Androscoggin County Jail.

14. Defendant Eric Samson is and was, at all times relevant to this Complaint, the Sheriff and an employee of Androscoggin County. At all times relevant to this Complaint, Sheriff Samson also served as the Interim County Administrator of Androscoggin County. He is sued in his official capacity.

15. Defendant Jeffrey Chute was, at all times relevant to this Complaint, the Jail Administrator at ACJ and an employee of Androscoggin County. He is sued in his official and individual capacities.

16. Defendant Lane Feldman was, at all times relevant to this Complaint, the Captain and Assistant Jail Administrator at ACJ and an employee of Androscoggin County. He is sued in his official and individual capacities.

17. Defendant William Gagne is and was, at all times relevant to this Complaint, the Chief Deputy of the Androscoggin County Sheriff's Office and an employee of Androscoggin County. He is sued in his official and individual capacities.

18. Defendant Tammy Chase was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. She is sued in her individual capacity.

19. Defendant John Clevenger was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

20. Defendant Paul Hamann was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

21. Defendant Miranda Kologenski was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. She is sued in her individual capacity.

22.     Defendant James Langelier was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

23.     Defendant Victoria Langelier was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. She is sued in her individual capacity.

24.     Defendant Jerry Larocque was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

25.     Defendant Rebecca Leduc was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. She is sued in her individual capacity.

26.     Defendant Bryan Litchfield was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

27.     Defendant Reginald Littlefield was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

28.     Defendant Isaac Poliquin was, at all times relevant to this Complaint, a correctional officer at ACJ and an employee of Androscoggin County. He is sued in his individual capacity.

29.     Defendants Jane and John Doe(s) were, at all times relevant to this Complaint, unidentified correctional officers at ACJ and employees of Androscoggin County. They are sued in their individual capacities.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 1983 and 1988.

31.     Pursuant to 28 U.S.C § 1391(b)(2) and D. Me. L.R. 3(h), venue is proper because all activities, incidents, events, and occurrences giving rise to this cause of action occurred in the County of Androscoggin, State of Maine.

## FACTUAL BACKGROUND

### Androscoggin County Jail and Its Policies, Customs, and Practices

32.     At all times relevant to this Complaint, Defendants Androscoggin County, Eric Samson, Jeffrey Chute, Lane Feldman, and William Gagne (collectively, the "Androscoggin County Defendants") were responsible for establishing and enforcing policies, customs, and practices at ACJ.

33.     Androscoggin County Defendants have a custom and practice of minimizing, neglecting, or ignoring ACJ inmates' medical needs, including those that place inmates at imminent risk of severe harm or death.

34.     Androscoggin County Defendants' custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs is demonstrated by, *inter alia*:

a.  Permitting ACJ corrections officers to openly, routinely, and baselessly accuse ACJ inmates of faking injuries or illnesses despite objective evidence to the contrary;

b.  Failing to train ACJ corrections officers on how to identify and report ACJ inmates' serious medical needs to appropriate medical personnel who possess the education, training and skill to evaluate the inmate and manage their medical needs;

c. Failing to ensure that ACJ corrections officers report ACJ inmates' serious medical needs to appropriate medical personnel who possess the education, training and skill to evaluate the inmate and manage their medical needs;

d. Failing to supervise or discipline ACJ corrections officers who have, through their prior statements, decisions and conduct, demonstrated deliberate indifference to or callous disregard for ACJ inmates with objective signs or symptoms of severe or life-threatening illness;

e. Failing to address ACJ corrections officers' deficient response to inmates' medical needs with new or additional training, systems or policies to correct these deficiencies;

f. Failing to train ACJ corrections officers to provide ACJ inmates with access to the medical care and equipment they need, internally or externally to ACJ;

g. Failing to ensure that ACJ corrections officers provide ACJ inmates with access to the medical care and equipment they need, internally or externally to ACJ;

h. Contracting with inadequate and incompetent medical providers to provide health care to ACJ inmates;

i. Permitting their contracted medical provider to violate its own written policies; and

j. Failing to train, and/or supervise the training, of ACJ medical department staff.

35. Androscoggin County Defendants' custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs was a proximate cause of Trevor's slow, painful, and traumatic decline and preventable death.

6

36.    Trevor's case was not the first time that ACJ Defendants' custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs violated the constitutional right of ACJ inmates to serve their time without cruel and unusual punishment.

37.    For example, ACJ once failed to treat an inmate for advanced-staged osteonecrosis.

38.    On another occasion, ACJ failed to treat the infected mouth of an inmate, allowing the infection to become so severe that it created a hole in the inmate's cheek.

39.    Another time, an ACJ inmate's condition was permitted to decline until the inmate nearly died of Covid, pneumonia, meningitis, and sepsis.

40.    During his time at ACJ, Trevor was supposed to be monitored continuously by Androscoggin County employees who worked as correctional officers at ACJ, including but not limited to Defendants Chute, Feldman, Gagne, Chase, Clevenger, Hamann, Kologenski, J. Langelier, V. Langelier, Laroque, Leduc, Litchfield, Littlefield, and Poliquin (each individually an "ACJ Defendant" and collectively the "ACJ Defendants").

41.    Trevor was also supposed to be monitored by several other unidentified Androscoggin County employees who worked as correctional officers at ACJ, referred to hereafter as Jane Doe(s) and John Doe(s) (each individually an "ACJ Defendant" and collectively part of the "ACJ Defendants").

42.    At all times relevant to this Complaint, Androscoggin County contracted with Correctional Psychiatric Services, P.C. ("CPS") to provide health care services, by and through its employees and agents, to inmates at ACJ.

43.    Defendant Androscoggin County has a non-delegable constitutional duty to provide constitutionally adequate health care to inmates at ACJ.

44. By contracting with CPS to provide health care services to inmates at ACJ, Defendant Androscoggin County adopted CPS's policies, customs, and practices of providing health care to inmates at ACJ as its own.

45. CPS and ACJ had a custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs.

46. CPS and ACJ's custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs is demonstrated by, *inter alia*:

    a. Failing to train ACJ medical staff on the proper use of the electronic medical record;

    b. Failing to ensure ACJ medical staff's proper use of the electronic medical record;

    c. Failing to train ACJ medical staff on when and how to refer ACJ inmates to on-call medical providers;

    d. Failing to ensure ACJ medical staff appropriately refer ACJ inmates to on-call medical providers;

    e. Failing to train ACJ medical staff on when to send ACJ inmates to external medical providers for care;

    f. Failing to ensure ACJ medical staff appropriately send ACJ inmates to external medical providers for care;

    g. Failing to train ACJ medical staff to recognize and appropriately respond to ACJ inmates' need for emergency medical care;

    h. Failing to ensure ACJ medical staff recognize and appropriately respond to ACJ inmates' need for emergency medical care;

    i. Failing to train ACJ medical staff to routinely take and document ACJ inmates' vital signs;

    j.   Failing to ensure ACJ medical staff routinely take and document ACJ inmates' vital signs;

    k.   Failing to establish proper nursing assessment protocols, including but not limited to protocols for chest pain;

    l.   Failing to train ACJ medical staff on the proper use of nursing assessment protocols, including but not limited to protocols for chest pain;

    m.  Failing to ensure ACJ medical staff properly use nursing assessment protocols, including but not limited to protocols for chest pain;

    n.   Failing to create an orientation for and adequately train and orient new members of the ACJ medical staff;

    o.   Failing to adhere to their own policies and procedures, including but not limited to its Continuous Quality Improvement policy; and

    p.   Prioritizing cost-saving over ACJ inmates' serious medical needs.

47.    CPS and ACJ's custom and practice of minimizing, neglecting, or ignoring ACJ inmates' serious medical needs was a proximate cause of Trevor's slow, painful, and traumatic decline and preventable death.

### The Interrelation of ACJ and CPS

48.    ACJ had *de facto* control over the hiring and firing of the health care providers and nurses at ACJ, whether they were CPS employees or independent contractors.

49.    At all times relevant to this Complaint, Wendy Riebe, R.N., oversaw the provision of health care services to ACJ inmates.

50.    At all times relevant to this Complaint, Nurse Riebe served as the Health Services Administrator ("HSA") at ACJ.

51.    Although Nurse Riebe was officially an employee of CPS, she served as the HSA before Androscoggin County contracted with CPS to provide medical care at ACJ.

52.    ACJ Defendants Chute and Feldman were, along with Nurse Riebe, responsible for hiring CPS in October 2022.

53.    ACJ and CPS agreed to a "cost-plus" contract, which required Defendant Androscoggin County to account for all costs not outlined in the contract, including but not limited to costs associated with sending ACJ inmates to external or emergency medical providers.

54.    The ACJ medical department policies, customs, and practices changed minimally, if at all, when CPS began providing medical care at ACJ.

55.    At all times relevant to this Complaint, in an effort to keep costs down, the ACJ medical department had a custom and practice of refusing to send ACJ inmates to external medical providers for care, including but not limited to emergency care providers.

56.    Nurse Riebe understood that one of her responsibilities as HSA, as defined by Androscoggin County Defendants, was to keep costs low for Defendant Androscoggin County.

**Trevor's Incarceration**

57.    On October 25, 2023, Trevor reported to ACJ. He was expected to serve 45 days.

58.    Trevor had a history of a spinal cord stroke. His left-side mobility was limited, but he walked independently, occasionally with the assistance of a cane.

59.    Trevor slept with braces on his left hand to prevent it from retracting. Left hand muscle retraction was a long-term effect of his stroke.

60.    Trevor's stroke also gave him long-term urinary hesitancy and incontinence, which he could manage independently and without medical devices if he had access to a restroom.

61.     Trevor reported his stroke and limited mobility to Androscoggin County Defendants, by and through ACJ Defendants, when he was booked at ACJ on October 25.

62.     ACJ Defendant Tammy Chase performed Trevor's inmate classification on October 25. He was placed in a cell in an ACJ minimum security block.

63.     Trevor also reported his stroke and limited mobility to the ACJ medical department during a medical screening on October 25. The screening, which noted the nature of Trevor's disability, became part of Trevor's medical record at ACJ, which was accessible to all ACJ medical staff.

64.     Early in Trevor's sentence, Pam brought Trevor's left hand braces to ACJ.

65.     Pursuant to an explicit or implicit ACJ policy, Trevor was not provided his braces.

66.     Without his left hand braces, Trevor struggled to use his left upper extremity and hand.

67.     Trevor's lack of his left hand braces made it more difficult for him to prevent, and then properly care for, the pressure ulcers he developed shortly after arriving at ACJ.

68.     The pressure ulcers caused open wounds, making Trevor at risk for developing infection.

### The Early Stages of Trevor's Illness

69.     Every time Trevor had a medical appointment, an ACJ Defendant escorted Trevor to the medical department.

70.     When he was too ill to travel to the medical department, medical visits took place in Trevor's cell. At these times, an ACJ Defendant escorted an ACJ medical staff member to Trevor's cell.

11

71.     ACJ Defendants were regularly physically present in the examination room or cell for Trevor's medical appointments.

72.     On or before November 1, Trevor began developing pressure ulcers on his lower back and buttocks.

73.     On November 1, Trevor reported two wounds on his lower back and buttocks to the medical department.

74.     On November 2, Trevor told Pam that the ACJ medical staff did not understand the nature of his disability.

75.     Later that day, Pam called the ACJ medical department and offered to provide them with Trevor's medical records so they could better understand his medical history. An ACJ medical staff member told Pam she could fax the records or drop them off in person.

76.     Pam dropped off Trevor's medical records at ACJ on November 2. She provided the records to ACJ Defendant John or Jane Doe, a corrections officer who was staffing the front desk.

77.     Neither Defendant John or Jane Doe or anyone else at ACJ provided Trevor's medical records to the ACJ medical department; those records were therefore not reviewed by any of the ACJ medical staff.

78.     On November 4, Trevor was seen by a nurse at ACJ. The nurse documented that Trevor had two wounds that had developed five days earlier.

79.     On November 4, a nurse practitioner prescribed rotating dressing changes to address Trevor's wounds.

80.     On November 6, Trevor was seen by a nurse practitioner for a telehealth assessment. He reported his wounds to her, but she did not physically examine them.

**Trevor's Condition Worsens**

81.     On November 11, Trevor presented to the ACJ medical department, escorted by Corrections Officer Jane and/or John Doe(s). Trevor reported that his wounds were painful and that the pain worsened when they contacted any surface.

82.     On November 12, Trevor reported feeling very ill and that his entire body hurt.

**Trevor's Chest Pain Is Ignored and Not Documented in the Medical Record**

83.     On November 13, an ACJ nurse evaluated Trevor in the medical department. Trevor complained of chest and upper back pain. Trevor's heart rate was abnormally high (tachycardic). He had diminished breath sounds in the base of his left lung.

84.     A reasonable medical provider presented with a patient complaining of chest and upper back pain, accompanied by tachycardia and diminished breath sounds, must be concerned about the possibility of potentially severe, life-threatening illness, including heart attack, pneumonia and pulmonary embolism.

85.     Nevertheless, the nurse, without consulting a doctor, determined that Trevor was "demonstrably stable despite the stated symptoms." The nurse suggested that Trevor was likely suffering from anxiety, despite the fact that rendering diagnoses is outside the scope of nursing practice and the patient's symptoms were equally consistent with several more severe medical conditions that had not been adequately ruled out.

86.     Because ACJ did not properly train or supervise its medical staff in the safe and proper use of the medical record to provide continuity of care, the nurse did not enter his November 13 note into the medical record. Therefore it was not available for review by other providers involved in Trevor's medical care.

87.     Consequently, ACJ medical staff who saw Trevor after November 13 were unaware of his report of chest pain.

88.     Despite the fact that chest pain is a common sign of a potential medical emergency—and despite the widespread availability and use of standardized "chest pain" protocols to ensure that life-threatening cardiac conditions are not missed—ACJ had no "chest pain" protocol or other policy that required a nurse to consult with ACJ medical department providers (nurse practitioners or physician assistants) or any other medical provider regarding patient chest pain.

### Trevor's Condition Continues to Deteriorate

89.     Between November 13 and 15, Trevor rarely left his cell in minimum.

90.     Trevor, who was in visible distress and had lost his ability to support his own weight and walk independently, writhed in pain and moaned for help in his bed. ACJ Defendants and medical department staff ignored Trevor's pleas.

91.     During that same time, ACJ Defendants also ignored the pleas of Trevor's cellmate and block mates who alerted them repeatedly to Trevor's rapidly declining condition.

92.     On November 14, Trevor presented to a nurse in the ACJ medical department "ambulating slow & unsteady."

93.     The nurse determined that Trevor's wounds were worsening and had become a medical emergency.

94.     The nurse has testified that he contacted the on-call medical department provider, and that he and the on-call provider agreed that Trevor needed to be seen by a provider outside the jail.

95.     The nurse has also testified that Nurse Riebe refused to send Trevor outside the jail for medical attention.

96.     Upon information and belief, Nurse Riebe's refusal to send Trevor outside the jail for medical attention was the result of an ACJ custom and practice that discouraged providing inmates with care from outside medical providers as a cost-saving measure.

**Trevor Is Moved from Minimum Security and Continues to Worsen**

97.     On November 15, Trevor was moved from his cell in minimum to OB-3, a cell in ACJ's "observation" or "holding" block.

98.     Corrections Officers Jane and/or John Doe(s) moved Trevor in a wheelchair because he could no longer walk on his own.

99.     Inmates in the observation block are supposed to be monitored continuously by ACJ Defendants via video and audio surveillance, observable from the "Control Room" located across the hall from OB-3.

100.    Inmates in observation are also supposed to be monitored by ACJ Defendants who round on the cells every 15 minutes.

101.    During these rounds, ACJ Defendants are supposed to inspect the physical cell to ensure its safety, check the that the inmate is "living" and "breathing," and check the inmate's "flesh," meaning their general appearance.

102.    The observation cells have no toilets or sinks. Instead, ACJ Defendants expect inmates to alert them when they need to use the bathroom; alternatively, inmates are forced to urinate or defecate into a grate on the cell floor.

103.    On November 15, Trevor was evaluated by an ACJ physician assistant in the presence of Corrections Officer Jane and/or John Doe(s).

15

104.    This medical appointment took place in Trevor's observation cell because he could not walk to the ACJ medical department.

105.    The physician assistant determined that Trevor could be suffering from rhabdomyolysis, a life-threatening condition where damaged muscles release toxins into the bloodstream, or sepsis, an inflammatory response to infection that leads to organ failure and death if not treated promptly.

106.    Nevertheless, the physician assistant did not take any steps to provide Trevor with emergency medical care.

107.    The physician assistant's failure to recommend that Trevor be sent to an outside provider for emergent care was the result of an ACJ custom and practice of discouraging staff from sending inmates for outside medical care because of the high cost of doing so.

108.    The physician assistant's failure to recommend that Trevor be sent to an outside provider for emergent care was also the result of an ACJ custom and practice of failing to train medical staff on and enforce the proper use of the electronic medical record.

109.    Later on November 15, Corrections Officers Jane and/or John Doe(s) moved Trevor via wheelchair to ACJ's maximum security block.

110.    Inmates in maximum are supposed to be monitored by ACJ Defendants through "living, breathing, flesh checks" every 15 minutes.

111.    Throughout the day on November 16, Trevor was too sick to get up and move about. He remained lying on his back in his cell.

112.    The ACJ Defendants knew that it was dangerous and painful for Trevor to remain lying on his back due to his pressure ulcers.

113.    ACJ Defendants also knew that Trevor was too weak to sit up, move or reposition himself.

114.    ACJ Defendants took no steps to move Trevor off his back to relieve pressure or to otherwise provide him with life-saving medical attention.

115.    On November 16, wound care was performed in Trevor's cell in the presence of Corrections Officer Jane and/or John Doe(s), because Trevor could not walk to the medical department.

116.    On November 17, at 8:20 am, Trevor fell off his bed and hit his head on a desk. This was further evidence of his deterioration.

117.    Although aware of Trevor's fall, ACJ Defendants took no steps to get him emergency medical care.

118.    Shortly after his fall, Trevor was moved via wheelchair back to observation cell OB-3 by ACJ Defendants Rebecca Leduc, Bryan Litchfield, Reginald Littlefield, and Isaac Poliquin.

119.    Trevor was weak and nodding off in his wheelchair.

120.    The bed in OB-3 is a cement slab raised just inches off the floor, with a plastic mattress placed on top of it.

121.    Corrections Officers Litchfield and Poliquin lifted Trevor from the wheelchair by his elbows and placed him on his side on the bed slab in OB-3.

122.    Before ACJ Defendants Leduc, Litchfield, Littlefield, and Poliquin left OB-3, Trevor was lying on his back, as he was physically unable to remain on his side.

123.    Nonetheless, ACJ Defendants took no steps to reasonably ensure that Trevor was properly positioned with pressure removed from his wounds.

17

124.    ACJ Defendants Leduc, Litchfield, Littlefield, Poliquin, and those monitoring Trevor by video, observed his rapidly declining condition, but remained deliberately indifferent to his imminent risk of severe harm or death, and took no steps to provide Trevor with emergency medical care.

125.    During his stay in OB-3, Trevor was so weak that he urinated on himself repeatedly while lying on his back.

126.    ACJ Defendants witnessed Trevor urinating on himself via video surveillance and during "living, breathing, flesh checks." It was objectively obvious that Trevor was continuing to decompensate physically and that he needed emergency medical care. Nonetheless, ACJ Defendants took no steps to facilitate such care.

127.    Around 9:00 am on November 17, Corrections Officer Poliquin accompanied a nurse into Trevor's cell for a routine medication pass.

128.    Corrections Officer Poliquin observed that Trevor was unable to hold a cup of water or sit up to take his medicine. Corrections Officer Poliquin grabbed Trevor by his uniform shirt to sit him upright.



129.    Corrections Officer Poliquin also observed that Trevor had urinated on the floor next to his bed slab.

130.    It was objectively obvious that Trevor was extremely ill and required emergency medical treatment

131.    ACJ Defendants continued to perform "living, breathing, flesh checks" on Trevor every 15 minutes, thereby observing his decline.

132.    Throughout his stay in OB-3, Trevor continued lying supine. He continued urinating from that position while lying on his bed slab. Urine visibly pooled on the floor of his cell.

133.    On November 17, Corrections Officer Litchfield and a nurse entered OB-3. Trevor told them that he could not move. Corrections Officer Litchfield grabbed Trevor's jail uniform and rolled him over to his side, so that the nurse could change the dressing on his wounds.



134.    The wounds were dark, odorous and obviously infected.

135.    It was obvious to Corrections Officer Litchfield, the ACJ nurse and the ACJ Defendants monitoring Trevor that his health was declining rapidly and he needed emergency medical care. Nonetheless, they took no steps to facilitate such care.

136.    During the evening of November 17, ACJ Defendants John Clevenger and John Doe entered OB-3 with an ACJ nurse for a medication pass. The ACJ Defendants and nurse watched Trevor, who was unable to sit up, attempt to pour Gatorade into his mouth while lying on his back. Trevor could not take his medication without assistance.

137.    On November 18, Trevor was provided food by ACJ Defendant John Doe. He was not able to eat it, and the full tray was later collected by Corrections Officer Leduc.

138.    Corrections Officer Leduc returned some hours later, accompanied by a nurse who was distributing medication. Corrections Officer Leduc attempted to hand Trevor a cup of water, which he could not hold. She attempted to prop Trevor upright, but he could not sit up, so he fell back onto the bed.

139.    Corrections Officer Leduc placed the medication in Trevor's mouth and poured water into his mouth while he was lying supine. Trevor remained on his back throughout the visit and when Corrections Officer Leduc left his cell.



140.    On the afternoon of November 18, ACJ Defendants Victoria Langelier, Larocque, and Leduc went to Trevor's holding cell to move him to maximum. Trevor told them he was unable to sit up on his own. After the officers sat him up, they told Trevor that he needed to help them by

standing on his feet. Trevor told them he could not do so. The officers lifted Trevor and placed

him in a wheelchair, which they used to transport him to his new cell.

141.    While they were retrieving Trevor, Corrections Officer V. Langelier noticed that

the floor was covered in urine.

142.    While he was being transported to maximum, Trevor was wheeled past Corrections

Officer Chase and ACJ Defendant James Langelier. They then assisted in his transport.

143.    When they arrived at maximum, Corrections Officer Larocque instructed Trevor to

get out of the wheelchair and walk into his cell. Trevor could not do so. Officer Larocque attempted

to pull Trevor to his feet. Trevor could not stand, and fell to his knees. Corrections Officer

Larocque lifted Trevor under the arms and dragged him into his cell.



144.    Corrections Officers Chase, J. Langelier, and V. Langelier watched this interaction

take place.

145.    At or around 4:36 pm, Corrections Officer Chase left a tray of food next to Trevor's

bed.

146.    Approximately twenty minutes later, Corrections Officers Chase and J. Langelier returned to collect the tray. They observed that Trevor did not eat any of the food on his tray and was "slow to move."

147.    Throughout this time, it was objectively obvious to ACJ Defendants that Trevor's health was declining rapidly, and that he needed emergency care. Nonetheless, they took no steps to facilitate such care.

### Trevor's Death

148.    On November 18, at 6:48 pm, ACJ Defendants Paul Hamann, Miranda Kologenski, and John Doe began performing the "living, breathing, flesh checks" in maximum every 15 minutes.

149.    At 8:00 pm, Corrections Officers Hamann, Kologenski, and John Doe escorted a nurse to Trevor's cell for a medical check.

150.    They found Trevor unresponsive on his bed.

151.    At 8:40 pm, Trevor was pronounced dead.

152.    At 10:00 pm on November 18, Pam was notified of Trevor's death.

153.    Later that evening, Pam spoke with ACJ Defendant William Gagne, who was aware of Trevor's decline during his incarceration, regarding the circumstances of Trevor's death. When Pam asked Chief Deputy Gagne how Trevor had died, he lied or actively misled her, stating that Trevor's cause of death "could have been something as simple as choking on coffee."

154.    On November 19, an autopsy was performed. Trevor's cause of death was determined to be lobar pneumonia. The autopsy report stated: "On the back is a padded gauze covering overlying the sacrum. This covers a stage 3 pressure ulcer with necrotic tissue present."

It also revealed bilateral empyema in Trevor's lungs, with "multiple scattered abscesses in the parenchyma."

155.    Trevor's pneumonia was the result of his untreated, infected pressure ulcers.

### COUNT I: VIOLATION OF 14 U.S.C. § 1983 – EIGHTH AMENDMENT
*As to Androscoggin County Defendants (Androscoggin County and Eric Samson, Jeffrey Chute, Lane Feldman, and William Gagne in their official capacities)*

156.    Plaintiff repeats and realleges the preceding paragraphs.

157.    Androscoggin County Defendants have a constitutional duty to provide adequate medical care to inmates at ACJ.

158.    In contracting with CPS to provide medical care to inmates at ACJ, the Androscoggin County Defendants adopted CPS's policies, customs, and practices as their own.

159.    As adopted by ACJ, CPS had policies, customs, and practices of permitting their medical staff to violate the constitutional rights of ACJ inmates, including but not limited to Trevor Saunders'.

160.    Separate and apart from the CPS policies it adopted as its own, Androscoggin County Defendants' had their own policies, customs, and practices of permitting its staff to violate the constitutional rights of ACJ inmates, including but not limited to Trevor Saunders'.

161.    These policies, customs, and practices were the moving forces behind Trevor Saunders' cruel and unusual death.

### COUNT II: VIOLATION OF 14 U.S.C. § 1983 – EIGTH AMENDMENT
*As to ACJ Defendants (Defendants Jeffrey Chute, Lane Feldman, William Gagne, Tammy Chase, John Clevenger, Paul Hamann, Miranda Kologenski, James Langelier, Victoria Langelier, Jerry Larocque, Rebecca Leduc, Bryan Litchfield, Reginald Littlefield, Isaac Poliquin, and Jane and John Does in their individual capacities)*

162.    Plaintiff repeats and realleges the preceding paragraphs.

23

163.    In serving as correctional officers at ACJ, ACJ Defendants acted under color of state law.

164.    The direness of Trevor Saunders' medical condition was apparent, and no objectively reasonable person could have mistaken or misunderstood the risks his condition posed to his health and life.

165.    ACJ Defendants had actual knowledge that Trevor Saunders' medical condition presented an imminent risk to his life.

166.    ACJ Defendants were deliberately indifferent to the imminent risk that Trevor Saunders' medical condition presented to his life.

167.    ACJ Defendants' deliberate indifference to Trevor Saunders' health and wellbeing caused him to suffer a cruel and unusual illness and death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests a judgment against Defendants for:

1.    Compensatory general and special damages authorized by law to the Estate of Trevor Saunders, including but not limited to all available damages for Trevor's mental anguish, physical pain and suffering, pecuniary loss, loss of enjoyment of life and wrongful and premature death;

2.    Punitive damages on Plaintiffs' claims under 42 U.S.C. § 1983 against Defendants Jeffrey Chute, Lane Feldman, William Gagne, Tammy Chase, John Clevenger, Paul Hamann, Miranda Kologenski, James Langelier, Victoria Langelier, Jerry Larocque, Rebecca Leduc, Bryan Litchfield, Reginal Littlefield, Isaac Poliquin, Jane Doe(s), and John Doe(s);

3.    Damages for the violation of Trevor's constitutional right under the Eighth Amendment to service his period of incarceration free from cruel or unusual punishment; and

4.      Costs, attorneys' fees, interest, and other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 38, Plaintiff hereby demands a jury for all issues so triable.

Date: June 9, 2025

_____ /s/ Taylor A. Asen _____
Taylor A. Asen, Esq., Me. Bar No. 5832
Rosalie Wennberg, Esq., Me. Bar No. 10316
*Attorneys for Plaintiff*
Gideon Asen, LLC
95 Main Street, #5
Auburn, ME  04210
(207) 206-8982
service@gideonasenlaw.com

25