UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

PAMELA ASHBY, as Personal )
Representative of the Estate of )
TREVOR SAUNDERS, )
                   )
        Plaintiff )
                   )
    v. )          No. 2:25-cv-00299-LEW
                   )
ANDROSCOGGIN COUNTY, et al., )
                   )
    Defendants )

## <u>ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

Plaintiff Pamela Ashby, as personal representative of the estate of her son, Trevor Saunders, has filed this lawsuit against Androscoggin County and seventeen individual defendants alleging that the circumstances of her son's death while he was incarcerated in the Androscoggin County Jail violated the Eighth Amendment of the U.S. Constitution. This matter is before the Court on the Motion to Dismiss (ECF No. 25) of two individual defendants, Bryan Litchfield and John Clevenger (for purposes of this Order, "Defendants"). For the reasons below, Defendants' Motion is DENIED.

### BACKGROUND

The following facts are drawn from the Complaint (ECF No. 1). Trevor Saunders reported to the Androscoggin County Jail (ACJ) on October 25, 2023, to serve a 45-day sentence. Compl. ¶¶ 3-4, 57. On November 18, 2023, Mr. Saunders was found dead in his cell. Compl. ¶ 5. The cause of his death was pneumonia, caused by untreated, infected

pressure ulcers.  Compl. ¶¶ 6-7, 155.  Defendants Litchfield and Clevenger were ACJ correctional officers during Mr. Saunders' incarceration.  Compl. ¶¶ 19, 26.

Mr. Saunders had a history of spinal cord stroke, which he reported at booking, and as a result had limited left-side mobility (which he managed with a walking cane), left hand muscle retraction (which he addressed by sleeping in a brace), and urinary hesitancy and incontinency (which he also managed independently).  Compl. ¶¶ 58-60.  Mr. Saunders initially reported pressure ulcers on his lower back to the ACJ medical department on November 1.  Compl. ¶¶ 72-73.  His condition continued to worsen over the next several days, and by November 13, he reported feeling very ill and experiencing chest and upper back pain.  Compl. ¶¶ 78-82.  He presented to the ACJ medical department on November 13 with tachycardia and diminished left-side breath sounds.  Compl. ¶ 83.

From November 13 to 15, Mr. Saunders rarely left his cell in the minimum security block.  Compl. ¶ 89.  He was in visible distress and had lost the ability to support his own weight.  Compl. ¶ 90.  Mr. Saunders, his cellmate, and his blockmates all reported his distress to ACJ staff, which ACJ staff ignored.  Compl. ¶¶ 90-91.  On November 14, Mr. Saunders was brought to see a nurse in the ACJ medical department, who determined that his condition was emergent.  Compl. ¶¶ 92-93.  The nurse and an on-call medical department provider determined that Mr. Saunders needed to be seen by an outside provider, but he was not.  Compl. ¶¶ 94-96.

On November 15, Mr. Saunders was moved (by wheelchair, as he was unable to walk) to a cell in ACJ's observation block.  Compl. ¶¶ 97-98.  He was seen by a physician assistant in that cell, who determined that Mr. Saunders could be suffering from

rhabdomyolysis or sepsis, both life-threatening conditions, but did not recommend emergency medical care from an outside provider. Compl. ¶¶ 103-5. Later that day, Mr. Saunders was moved again to ACJ's maximum security block. Compl. ¶ 109. Throughout the next day (November 16), Mr. Saunders was too sick to get up and move about and instead remained lying on his back in his cell. Compl. ¶ 111. ACJ staff knew that it was dangerous and painful for Mr. Saunders to remain lying on his back due to his pressure ulcers and that he was too weak to sit up or reposition himself, but took no steps to help move him or give him medical attention. Compl. ¶¶ 112-14.

At around 8:20 a.m. the morning of November 17, Mr. Saunders fell off his bed and hit his head on a desk. Compl. ¶ 116. ACJ staff did not seek emergency medical care. Compl. ¶ 117. Shortly after this fall, ACJ staff (including Defendant Litchfield), moved Mr. Saunders back to the observation block by wheelchair. Compl. ¶ 118. He was weak and nodding off in the chair. Compl. ¶ 119. Defendant Litchfield and others lifted Mr. Saunders from the chair and placed him on his side on the bed. Compl. ¶ 121. Mr. Saunders was unable to remain on his side, and was lying on his back again by the time Defendant Litchfield and the other ACJ staff left the cell. Compl. ¶ 122. They did nothing else to ensure that Mr. Saunders was properly positioned to remove pressure from his wounds. Compl. ¶ 123.

Cells in the observation block are monitored continuously by video and audio surveillance and with "living, breathing, flesh checks" conducted by ACJ staff at 15-minute intervals. Defendant Litchfield and others conducting this monitoring observed Mr. Saunder's condition rapidly decline. Compl. ¶ 124. Mr. Saunders urinated himself

3

repeatedly while lying on his back.  Compl. ¶ 125.  At approximately 9:00 a.m., ACJ staff accompanied a nurse into the cell for a medication pass, during which Mr. Saunders was unable to sit up or hold a cup of water by himself.  Compl. ¶¶ 127-28.  Afterwards, Mr. Saunders remained supine and continued urinating from that position to the point where urine pooled visibly on the floor of his cell.  Compl. ¶ 132.

ACJ staff continued to perform "living, breathing, flesh checks" every 15 minutes. Compl. ¶ 131.  When Defendant Litchfield and a nurse next entered Mr. Saunders' cell, Mr. Saunders told them he could not move, and Defendant Litchfield grabbed him by his uniform and rolled him onto his side so that the nurse could change the dressings on his wounds, which were dark, odorous, and obviously infected.  Compl. ¶¶ 133-34.  It was obvious to both that Mr. Saunders' health was declining rapidly and that he needed emergency care, but neither took steps to provide it.  Compl. ¶ 135.  That evening, Defendant Clevenger and other ACJ staff entered Mr. Saunders' cell for a medication pass. Compl. ¶ 136.  They watched Mr. Saunders attempt to pour Gatorade into his mouth while lying on his back, as he was unable to sit up.  *Id.*  He could not take his medication without assistance.  *Id.*

The morning of November 18, ACJ staff provided Mr. Saunders a tray of food, which he was unable to eat.  Compl. ¶ 137.  ACJ staff returned with a nurse hours later to distribute medication, and Mr. Saunders was again unable to sit up or hold a glass of water. Compl. ¶ 138.  When Mr. Saunders fell back onto his back, ACJ staff placed the medication in his mouth and poured water into his mouth while he was lying supine.  Compl. ¶¶ 138-39.  He remained in that position when ACJ staff left his cell.  Compl. ¶ 139.  That

afternoon, ACJ staff returned to Mr. Saunder's cell to move him to the maximum security block. Compl. ¶ 140. He told the staff that he was unable to sit up or stand on his own, so they lifted him into a wheelchair, which they used to transport him to his new cell. *Id*. They noticed the floor was covered in urine. Compl. ¶ 141. When they arrived at the new cell, a corrections officer lifted Mr. Saunders under his arms and dragged him into the cell because Mr. Saunders could not stand or walk. Compl. ¶ 143.

At around 5:00 p.m., corrections officers returned to Mr. Saunders' cell to collect a tray of food, which he had left uneaten, and observed the Mr. Saunders was "slow to move." Compl. ¶ 146. At 8:00 p.m., corrections officers escorted a nurse to Mr. Saunder's cell for a medical check and found him unresponsive. Compl. ¶¶ 149-50. At 8:40 p.m., Mr. Saunders was pronounced dead. Compl. ¶ 151. An autopsy was conducted the next day, which determined his cause of death to be lobar pneumonia and documented a stage 3 pressure ulcer with necrotic tissue present at Mr. Saunder's sacrum and bilateral empyema in Mr. Saunder's lungs. Compl. ¶ 154.

## DISCUSSION

To avoid dismissal, Plaintiff must provide "a short and plain statement of the claim showing that [she] is entitled to relief," Fed. R. Civ. P. 8(a)(2), that is, a complaint that contains "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In applying this standard, I accept Plaintiff's well-pled factual allegations as true and consider whether the facts, along with reasonable inferences that may arise from them, describe a plausible, as opposed to a merely conceivable, claim. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011);

*Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010).  I will not credit conclusory statements that merely recite the elements of the claim.  *See Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) ("We do not credit legal labels or conclusory statements, but rather focus on the complaint's non-conclusory, non-speculative factual allegations and ask whether they plausibly narrate a claim for relief.").

Defendants argue that the Complaint, which alleges violations of the Eighth Amendment and seeks relief under 42 U.S.C. § 1983, fails to state a claim against them.  In the alternative, they argue that they are entitled to qualified immunity.  The qualified immunity inquiry has two components: "whether the facts alleged . . . make out a violation of a constitutional right," and "if so, whether the right was 'clearly established'" at the time of the alleged violation.  *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (internal citation omitted).  The first question before me, then, is whether the Complaint plausibly alleges that Defendants violated the Eighth Amendment.

"It is well established that 'deliberate indifference to serious medical needs of prisoners [is] proscribed by the Eighth Amendment,'" and "actionable under 42 U.S.C. § 1983." *Abernathy v. Anderson*, 984 F.3d 1, 6 (1st Cir. 2020) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To succeed on such a claim, Plaintiff must show (1) that "as an objective matter," the inmate had a "serious medical need that received inadequate care," *id*. (cleaned up), and (2) that Defendants' failure to provide such care was, as a subjective matter, "purposeful" or in "wanton disregard to [the] prisoner's needs," *id.*, *see also Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 39 (1st Cir. 2011) (requiring "a showing of culpability greater than negligence but less than a purpose to do harm").  In other words,

6

"the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Defendants do not appear to dispute that Mr. Saunders' serious medical needs received inadequate treatment. Rather, Defendants argue that Plaintiff's Complaint does not contain sufficient facts to show that they were, individually, deliberately indifferent to those needs.

Defendants argue that because Mr. Saunders was receiving *some* medical care before he died, Plaintiff must allege facts "that would allow the reasonable inference that Clevenger or Litchfield were aware that the care being rendered was inadequate." Mot. at 13. The Complaint alleges that both Defendants interacted with Mr. Saunders within the 48 hours preceding his death, during which period Mr. Saunders displayed clear, unmistakable signs of severe illness.[1] The infected wounds on his back were dark and odorous. *See* Compl. ¶ 134. He was weak to the point of being unable to move, sit up, eat, drink or take medication independently. *See id.* ¶¶ 118-22, 133, 136. He had urinated himself repeatedly, to the extent that urine pooled visibly on the cell floor. *See id.* ¶¶ 125-26, 132. Although medication was administered, it provided no apparent relief to Mr. Saunders. I have little trouble inferring from these allegations that Mr. Saunders' dire need for emergent medical care in a hospital setting could have been apparent to a lay person.

---

[1] Plaintiff and Defendants disagree about whether allegations against the "ACJ Defendants" collectively can be held against Defendants Litchfield and Clevenger individually at this stage. Because I conclude that the Complaint alleges sufficient facts about Defendants Litchfield and Clevenger individually to state a deliberate indifference claim, I do not address the issue further.

And while jail staff without medical training are "generally justified in relying on the expertise and care of prison medical providers," *Matthews v. Pa. Dept. of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015), the facts that Plaintiff has alleged here cast sufficient doubt on whether any such reliance was "reasoned" or "justifiable," *Snell v. Neville*, 998 F.3d 474, 498 (1st Cir. 2021), to warrant discovery on the issue.[2] *See also Alsina-Ortiz v. Laboy*, 400 F.3d 77, 83 (1st Cir. 2005) (acknowledging that "[r]easonable reliance on others and lack of expertise may both be fair points," but nonetheless rejecting the defendant's argument that because he was "not a healthcare provider," he "should not be expected to parse symptoms, especially of someone already under medical care").  Perhaps it will bear out that Defendants Clevenger and Litchfield believed or assumed that Mr. Saunders was receiving constitutionally adequate medical care—for now, I am satisfied that Plaintiff has plausibly alleged that this was not the case.

Defendants next argue that the claims against them should be dismissed because they are entitled to qualified immunity.  As explained above, whether Defendants are entitled to qualified immunity depends upon "whether the right was 'clearly established'" at the time of the alleged violation.  *Penate*, 944 F.3d at 366 (internal citation omitted).  Whether a right was "clearly established" in turn depends upon "the clarity of the law at the time of the violation" and "the facts of the particular case"—specifically, "whether a

---

[2] To my reading, the caselaw Defendants have mustered on this point provides that non-medical jail staff do not violate the Eighth Amendment when they rely on medical staff to diagnose and treat inmates, "[a]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Matthews*, 613 Fed. App'x at 170 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also McGee v. Parsano*, 55 F.4th 563, 575 (7th Cir. 2022) (reaffirming that "corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment").

reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Id*. (internal citation omitted); *see also Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009) ("The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

Defendants argue that it would not have been "clear to a reasonable officer that his conduct was unlawful in the situation" described in the Complaint, where the inmate was receiving ongoing (though inadequate) care from medical staff. *Maldonado*, 568 F.3d at 269. Litigants often demonstrate that "the law is clearly established" through "earlier cases involving 'fundamentally similar' facts" or "cases with 'materially similar' facts," but neither is "necessary to such a finding," as "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Irish v. Fowler*, 979 F.3d 65, 76 (1st Cir. 2020). Plaintiff has not identified any case where non-medical staff was found to be deliberately indifferent to the serious medical needs of an inmate who was receiving ongoing medical care.[3] In my view, however, the mere fact that an inmate receives some form of medical care is not an antidote that automatically absolves non-medical jail staff of all responsibility for that inmate's

---

[3] As Defendants observe, the cases Plaintiff has identified involve situations where the defendant was a medical professional, *see Dantone v. Bhaddi*, 570 F. Supp. 2d 167, 173 (D. Mass. 2008), or someone without medical training who failed to seek help for an inmate who was not actively under the care of medical professionals, *see Avery v. Wellpath, LLC*, No. 2:20-cv-428, 2021 U.S. Dist. LEXIS 97834, at *5 (D. Me. May 24, 2021), *Alsina-Ortiz*, 400 F.3d at 83.

health and safety.  If an inmate is receiving medical care that is obviously inadequate to address the inmate's serious medical needs, and non-medical staff recognize this but do nothing, they are deliberately indifferent to "an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837; *see also McGee v. Parsano*, 55 F.4th 563, 573-75 (7th Cir. 2022) (reasoning that "the key question" under "the qualified-immunity standard" was "whether [the inmate's] treatment was so obviously inadequate that *every* reasonable officer would have known that he could not rely on [the nurse's] medical judgment").  If the care Mr. Saunders was receiving was so obviously inadequate that a person without medical training would recognize the danger presented, then I do not see how a reasonable officer in that position "could have believed that [he] was not violating [Mr. Saunders'] constitutional rights" by failing to do more.  *Decotiis v. Whittemore*, 635 F.3d 22, 38 (1st Cir. 2011).

Although a defendant's immunity from suit should be "resolved at the earliest possible stage in litigation," *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009), as a practical matter, "[i]t is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity," *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010).  "[T]he plausibility standard creates tension at this stage of litigation between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery." *Brown v. Cumberland Cty.*, 557 F. Supp. 3d 169, 177 (D. Me. 2021) (quoting *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018)).  If the allegations concerning the quality of the medical care provided, the inmate's physical condition, and the non-medical staff's awareness of the same do not tend to absolve the non-medical staff

10

of liability, then the existence of deliberate indifference ought to be assessed with the benefit of discovery. The question of whether Defendants' conduct amounted to deliberate indifference under the circumstances Plaintiff has alleged here will depend on facts that have not yet been proven.

Nothing in this discussion forecloses Defendants from raising the qualified immunity defense again once the relevant facts have been discovered. "[C]orrections officers may rely on the judgment of jail health professionals, and the qualified-immunity doctrine protects officers from reasonable mistakes when they do." *McGee*, 55 F.4th at 575. These principles set a very high bar for Plaintiff to clear if she is to prevail at summary judgment, but reading the Complaint in the light most favorable to her, and drawing all reasonable inferences in her favor, I conclude that she has plausibly alleged a deprivation of a clearly established right, such that a reasonable corrections officer would have appreciated the deprivation despite—or potentially even because of—the ACJ medical department's approach to Mr. Saunder's care.

## CONCLUSION

For these reasons, Defendants' Motion to Dismiss (ECF No. 25) is DENIED.

SO ORDERED.

Dated this 4th day of May, 2026.

/s/ Lance E. Walker
Chief U.S. District Judge